[Crim. No. 2864.   First Dist, Div. One.   Mar. 31, 1953.]

THE PEOPLE, Respondent, v. ROBERT FRYE, Appellant.

Robert Frye, in pro. per., for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Charles E. McClung, Deputy Attorney General, J. F. Coakley, District Attorney (Alameda), and Richard C. Lynch, Deputy District Attorney, for Respondent.

WOOD (Fred. B.), J.—The defendant appeals from the judgment entered upon his conviction on two counts: Count 1, rape; Count 2, assault with intent to commit rape. He also appeals from the order denying his motion for a new trial.

His notice of appeal, dated June 7th, was received by the clerk of the trial court June 10, 1952, but under rule 31

should have been received June 6th. It appears from a letter of the warden of the state prison where defendant was incarcerated, that the defendant requested permission to forward his notice on June 5, 1952, ''but due to the necessary delay in procedure here, we were unable to arrange for his signing and mailing the Notice until today [June 9] . . . We assume that this Notice is timely within the rule of *People* v. *Slobodion,* (30 Cal.2d 362 [181 P.2d 868]) and *People* v. *Aresen* [91 Cal. App.2d 26 (204 P.2d 389)].'' For those reasons we hold that the defendant made a constructive filing within the prescribed time limit and satisfied the jurisdictional requirement as contemplated by law.

(1) *Defendant claims that his conviction of the crime of rape (Count 1) is not supported by the evidence.*

In that behalf, he contends that the complaining witness' testimony was self-contradictory and that she related facts inherently improbable; that there was no evidence that she resisted him; that because of darkness, it is apparent she could not have identified him as the person who attacked her; and her testimony is not corroborated.

Our examination of the record convinces us that these points are not well taken. ██ Corroboration of the prosecutrix' testimony is not necessary in such a case. ██ Section 1108 of the Penal Code is inapplicable because rape is not one of the crimes therein mentioned. ██ Section 1111 of that code is also inapplicable because the victim in a rape case is not an ''accomplice,'' not a person ''who is liable to prosecution for the identical offense charged against the defendant on trial.'' (See *People* v. *Gidney,* 10 Cal.2d 138 [73 P.2d 1186], and 22 Cal.Jur. 399.)

██ As a reviewing court, we ''must accredit to the decision of the trial judge a familiarity with the witnesses and their testimony and assume that in denying a new trial he acted with understanding and with a regard for the function of the jury. Those instances in which the appellate courts have overridden the conclusions of the jury and the trial courts are where the testimony of the complaining witness is uncorroborated and it is so obviously and so inherently false and unbelievable that reasonable minds may not differ with respect to its character. (*People* v. *Jefferson,* 31 Cal.App.2d 562, 566 [88 P.2d 238].) For testimony which has effected a conviction by a jury with the approval of the trial court 'to justify a reversal on that ground it should clearly appear that the verdict is the result of passion and prejudice.' (*Ibid.*

*People* v. *Lewis,* 18 Cal.App. 359 [123 P. 232].)'' (*People* v. *Holquin,* 48 Cal.App.2d 551, 555 [120 P.2d 71]. See, also, *People* v. *Brown,* 100 Cal.App.2d 207 [223 P.2d 60].)

The prosecutrix' testimony as to the first count was not inherently improbable; was believed by the jury; and, therefore, cannot be rejected by us. A summary of the salient features of her testimony will suffice.

The victim lives with her family in Oakland, across the street from Raimondi Park. On the evening of October 28, 1951, at about 8 p.m., she left her home alone to attend a movie. When she reached a certain street intersection alongside the park (it was dark and there was poor artificial light at the corner) a man approached her walking in the opposite direction. He grabbed her, put both arms around her and threw her to the ground. At first she screamed but he put his hands on her throat, choked her and told her not to scream any more. He had a knife in his hand; she did not see it but she felt it, managed to grab the knife and threw it away. He then pulled her to her feet and marched her towards the rest room in the park. He had something pressed against her back, and told her to walk or he would shoot her. She did not see this object but assumed it was a gun. She asked him if he wanted her money but he refused it and said when he grabbed women like that he wanted intercourse. She did not scream after he had thrown her to the ground and told her not to scream because she was afraid. There were no lights in or around the rest room building. He took her into the ladies' rest room and told her to lie down. She did not do so fast enough so he threw her down. He took her coat off and threw it over the rest room door. She told him she was pregnant, that he might hurt her and that she wanted to go home to her five children. He disregarded her statements, and told her she should have stayed home with her children. He then accomplished the act. It was without her consent. She was afraid he would injure her because she was pregnant and she thought he had a gun. He performed more than this act of intercourse. They were in the ladies' room until 11:00 or 11:30. The man held her during most of this time and when not holding her stood where she could not get around him to get out. He smoked cigarets off and on. She was afraid to look at him but glanced at him every time he lighted a cigaret. About 11:00 he forced her to go into the men's room in the same building. He told her he usually killed women he caught like that, and that he would go just as far for rape as he would for murder.

She was again pushed to the floor and he again had intercourse more than once. They stayed in the men's room about an hour and a half or two hours. During this time she heard someone enter the adjoining room but did not scream because, as stated by her, "I was pregnant and I could not wrestle with nobody." He took her outside, had another act of intercourse outside the building and later, about 3 a.m., told her he would let her go. She went towards her home and on the way met two policemen in a patrol car. They took her to the inspector's office and then to Highland Hospital where she was examined. The doctor who examined her testified that the examination showed injuries and abrasions about the external genitalia, live sperm in the vagina and a pregnant condition about four months along. It was the doctor's opinion it would take a very forceful act of intercourse to cause the abrasions. The police showed the witness some pictures of various men prior to March, 1952. She told them that one man "favored" the man who raped her. She found out that this man was 6 feet 2 or more inches tall and on that basis decided he wasn't the man that raped her, because the latter man was not as tall as her husband who was 6 feet 2 inches tall. In March, 1952, she identified a picture of defendant from a group of pictures shown to her by the police, as the man who raped her. She identified defendant in court as the same man who raped her on the 28th of October, 1951.

Concerning resistance by the victim, the statute defines rape as an act of sexual intercourse accomplished with a female, not the wife of the perpetrator, under either of the following circumstances, among others: "3. Where she resists, but her resistance is overcome by force or violence" and "4. Where she is prevented from resisting by threats of great and immediate bodily harm, accomplished by apparent power of execution." (Pen. Code, § 261.) The force which defendant exerted and the threats he uttered, particularly in view of the victim's pregnant condition, amply support an implied finding that her resistance was overcome by the methods defined in each of clauses (3) and (4) of section 261. ■ The following observations of the reviewing court in *People* v. *Tollack*, 105 Cal.App.2d 169 at 171-172 [233 P.2d 121], are peculiarly apt in our case: "If the female resists, but her resistance is overcome by force *or* violence, rape is committed under the conditions prescribed by subdivision 3 of section 261. The gravamen of the offense is the use of force or violence sufficient to overcome the resistance of the female. Bodily

injury is not the essence of the offense. The word 'force' implies physical power exerted upon a person or thing. (*People* v. *McIlvain*, 55 Cal.App.2d 322, 328, 331 [130 P.2d 131].) In *People* v. *Bradbury*, 151 Cal. 675 [91 P. 497], quoting from Bishop on Criminal Law, it was said, p. 677: ' "The kind of physical force is immaterial; . . . it may consist in the taking of indecent liberties with a woman, or laying hold of and kissing her against her will." ' The prosecutrix testified that while on the sidewalk defendant took her arm and turned her around; that he edged her from the sidewalk to the place where the act was committed; put his hands underneath her clothes and fondled her; put his hand inside her blouse; and that he raised and pushed her clothing aside. The evidence was sufficient to bring the offense within subdivision 3 of section 261. If the female is prevented from resisting by threats of great and immediate bodily harm, accompanied by apparent power of execution, rape is committed under the conditions prescribed by subdivision 4. Threats to do bodily harm were made and the consent of the prosecutrix was obtained as a result of those threats (*People* v. *Peterman*, 103 Cal.App.2d 322, 324 [229 P.2d 444].) The threats were accompanied by apparent power of execution. 'A submission induced by fear is not acquiescence.' (*People* v. *Blankenship*, 103 Cal.App.2d 60, 67 [228 P.2d 835].) The evidence was also sufficient to bring the offense within subdivision 4." (See, also, *People* v. *Cassandras*, 83 Cal.App.2d 272, 277-279 [188 P.2d 546]; *People* v. *Blankenship*, 103 Cal.App.2d 60, 64-66 [228 P.2d 835]; *People* v. *Peterman*, 103 Cal.App.2d 322, 324-325 [229 P.2d 444]; *People* v. *Harris*, 108 Cal.App.2d 84, 89-90 [238 P.2d 158]; *People* v. *Flores*, 62 Cal.App.2d 700, 703-705 [145 P.2d 318]; *People* v. *Lay*, 66 Cal.App.2d 889, 892-893 [153 P.2d 379].)

The victim's identification of the defendant was positive. We cannot substitute our judgment for that of the jury on the question whether or not she had a sufficient opportunity to observe his features to enable her to identify him. Although the rest room in the park was unlighted defendant smoked cigarets with some frequency while there and the prosecutrix glanced at him every time he lighted a cigaret. The evidence supports the implied finding that defendant was the man who attacked her.

(2) *As to the second count, defendant claims the evidence is not sufficient to support an implied finding of intent to commit rape.*

This point, also, is not well founded.

■ According to her testimony, the victim was returning home from church about 9 in the evening of March 16, 1952, on Campbell Street, next to Raimondi Park, Oakland. As she approached a street intersection she met a man coming toward her. When he got to her he stuck a knife up to her neck but did not grab hold of her. He told her to start walking and that if she screamed he would cut her throat. She dropped some songbooks she was carrying and screamed until he started choking her so she could not scream. She offered him money but he told her to do as he said. He forced her into the park and then into the rest room building. She screamed twice before she arrived at the rest room. After he got her into the rest room he got her down on the floor, tried to get her coat off and her dress up, and she bit his thumb and started screaming again. During this time she heard her son and his friends outside the rest room. This man had kept the knife at her throat while he and she approached the rest room and still had it in the rest room. He nicked her with the knife but not enough for it to bleed. She identified the defendant in court as the same man. While the struggle was going on her son and two of his friends came into the rest room. The man said "wait and let me explain to you, I was only playing," and then he ran across the park. The boys ran after him and caught him after he fell in the park.

Her son testified that he heard someone scream, thought it was his mother, ran outside their home (which was nearby, opposite the park), met two of his friends on the street, who with him went toward the rest room. A few seconds later he heard her scream again. He called out "May, is that you?" and a man's voice replied, "No, this isn't May." The son and one of his friends ran in. His mother was scuffling on the floor and the man was over her and had her dress up. The man said he wanted to explain, and that he was just playing. The boys stepped from the door and the man ran out with the boys after him. They caught him, threw him down, and proceeded to beat him. His mother came up, told him not to kill the man and then they took the man out on the street. The police arrived thereafter.

The jury was amply justified in inferring from this evidence that the defendant assaulted this prosecutrix with intent to have sexual intercourse with her and to use force to overcome her resistance; i.e., assault with intent to commit

rape. "The crime of assault with intent to commit rape was committed, if defendant intended to have sexual intercourse with his victim and to use force to overcome her resistance." (*People* v. *Nye,* 38 Cal.2d 34, 37 [237 P.2d 1].)

The testimony of the victim's son corroborated her testimony, but there was no legal requirement for such corroboration because this victim, like the victim of the offense charged in Count 1, was not an accomplice of the defendant.

(3) Defendant suggests that some of the court's instructions may have been erroneous, but as the transcript upon this appeal does not contain the instructions given, we are unable to consider this point. ▪ "Instructions not incorporated in the record will be presumed correct and will not be reviewed." (4 Cal.Jur.2d 441, Appeal and Error, § 569, note 12, and cases cited.)

▪ (4) Defendant complains that he was not properly represented at the trial, suggesting that his counsel should have cross-examined the prosecutrix more vigorously at the trial. This point is without merit. The record indicates that his counsel conducted an extensive cross-examination of the prosecutrix, covering substantially all of her testimony, with emphasis upon her identification testimony. This is not to suggest that the State would be responsible for the negligence, if any, of defendant's counsel, had defendant's counsel been negligent, which he was not.

▪ (5) Finally, defendant requests reversal "on all statutory grounds set forth in sections 261, 264, 1111, 1158(a) of the Penal Code." This is too general a statement to be meaningful. Sections 261 and 264 merely define rape and prescribe the punishment therefor. Section 1111 defines "an accomplice" and requires his testimony to be corroborated. Section 1158(a) relates to the form of verdict in certain types of cases not involved here.

The judgment and the order appealed from are affirmed.

Peters, P. J., and Bray, J., concurred.